**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

HODES & NAUSER, MDs, P.A.; HERBERT C. )
HODES, M.D.; and TRACI LYNN NAUSER, M.D., )
)
)
Plaintiffs, )
)           CIVIL ACTION
v. )
)           Case No. _11-2365-RDR-KGS_____
ROBERT MOSER, M.D., in his official capacity as )
Secretary of the Kansas Department of Health and )
Environment; STEPHEN HOWE, in his official )           PLACE OF TRIAL REQUESTED:
capacity as District Attorney for Johnson County; and )           KANSAS CITY, KANSAS
DEREK SCHMIDT, in his official capacity as )
Attorney General for the State of Kansas, )
)
Defendants. )
)

**COMPLAINT**

Plaintiffs, Hodes & Nauser, MDs, P.A. Herbert Hodes, M.D., Traci Nauser, M.D.

(collectively "Plaintiffs"), by and through their undersigned attorneys, bring this complaint

against above-named Defendants, their employees, agents, and successors in office

("Defendants") and in support thereof state the following:

**I. Preliminary Statement**

1.        This is an action under the U.S. Constitution and 42 U.S.C. § 1983 brought by  a

private obstetrics and gynecology practice and the father-daughter team of physicians who own

and operate that practice, challenging the constitutionality of the licensing provisions of Kansas

Senate Bill No. 36 (2011) ("Act")[1], Act, at sec. 2, 8,  as applied by Defendant Secretary of the

Kansas Department of Health and Environment ("KDHE")[2] through a sham licensing process, in

which  KDHE  promulgated  onerous  and  medically  unnecessary  regulations  ("Temporary

---

[1] A true and correct copy of the Act is attached hereto as Exhibit A.
[2] For the reader's convenience Secretary Moser is referred to as "KDHE" throughout.

Regulations") without giving regulated persons and entities notice or an opportunity to be heard, and imposed absurdly short deadlines for compliance with those regulations.[3]  When the Act and Temporary Regulations take effect on July 1, 2011, Plaintiffs, and other medical practices, will be prohibited from performing virtually all abortions[4] in their medical offices unless they bring those offices into compliance with the Temporary Regulations, Act, at sec. 1(f), 2(a), which Plaintiffs received just nine business days before the effective date.

2.      At every step of the challenged process, KDHE implemented the licensing provisions of the Act in ways that made it impossible for existing medical practices to obtain a license by the effective date:  (a) KDHE drafted and finalized Temporary Regulations without giving the facilities to be regulated any opportunity to comment on the regulations, despite the lack of any urgent circumstances necessitating that course of action; (b) KDHE included in the Temporary Regulations medically unnecessary, burdensome and inappropriate requirements, such as rigid specifications as to the number, type and dimensions of rooms in the facility, that cannot possibly be achieved in a matter of weeks; (c) KDHE conditioned licensure upon compliance with the Temporary Regulations, which were not sent to abortion providers until after the close of business on June 17, 2011, less than two weeks before the Act was to take effect; and (d) KDHE refused to consider waiver requests, provisional licensing, or any other accommodations for existing facilities.

---

[3] A true and correct copy of the regulations, which are to be codified at Kan. Admin. Regs. § 28-34-126 - 44 (2011), is attached hereto as Exhibit B.

[4] The Act applies to any facility that performs five or more first-trimester abortions in a month, or any second or third trimester abortions, excluding abortions performed due to a medical emergency. The Act defines a "medical emergency" as "a condition that, in a reasonable medical judgment [sic], so complicates the medical condition of the pregnant woman as to necessitate the immediate abortion of her pregnancy without first determining gestational age in order to avert her death, or for which a delay necessary to determine gestational age will create serious risk of substantial and irreversible physical impairment of a major bodily function." Act, at sec. 1(i). The Act specifies that a medical emergency does *not* include a situation in which there is a "claim or diagnosis that the woman will engage in conduct which would result in her death or in substantial and irreversible physical impairment of a major bodily function." *Id.*

2

3.      For decades, Plaintiffs have provided safe, high-quality obstetrical and gynecological services, including abortion services, in their private medical office.  That office meets the needs of their patients, the applicable standards of care, and the existing state regulations governing medical facilities that perform office-based surgeries.  Nonetheless, that office cannot meet all of the requirements of the Temporary Regulations, and it is impossible to bring the facility into full compliance by the effective date.   Accordingly, in the absence of relief from this Court, beginning on July 1, 2011, Plaintiffs will be forced to stop providing virtually all abortion services in their office, causing irreparable harm to Plaintiffs' medical practice and to the health and well-being of their patients seeking abortions.  Plaintiffs seek temporary, preliminary and permanent injunctive relief against the Temporary Regulations and the licensing requirements of the Act as applied by KDHE through its adoption and implementation of the Temporary Regulations (referred to herein as the "Licensing Process").  Such injunctive relief is necessary to prevent irreparable harms and the violation of rights secured to Plaintiffs and their patients by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**II. Jurisdiction and Venue**

4.      This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

5.      Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202.

6.      Venue in this court is proper under 28 U.S.C. 1391(b) because a substantial part of the events giving rise to this action occurred in this district.

**III. Parties**

**A. Plaintiffs**

7.      Plaintiff Herbert C. Hodes, M.D., is a board-certified obstetrician-gynecologist licensed to practice medicine in Kansas.  He is a fellow of the American College of Obstetricians and Gynecologists and holds admitting and clinical privileges at a number of hospitals in the Kansas City area.  He has been providing a full range of obstetrical and gynecological services, including first and second-trimester abortions, in his private medical practice for 34 years.

8.      Plaintiff Traci Lynn Nauser, M.D., is a board-certified obstetrician-gynecologist licensed to practice medicine in Kansas.  She is a fellow of the American College of Obstetricians and Gynecologists and holds admitting and clinical privileges at a number of hospitals in the Kansas City area.  She joined the medical practice of her father, Dr. Hodes, 13 years ago, and she has been providing a full range of obstetrical and gynecological services, including first and second-trimester abortions, in that practice ever since.

9.      Plaintiff Hodes & Nauser, MDs, P.A. is the private medical practice owned and operated by Dr. Hodes and Dr. Nauser (the "practice").  The practice is located in Overland Park, Kansas, and advertises under the name "Center for Women's Health."

10.      Plaintiffs Dr. Hodes and Dr. Nauser provide a full range of obstetrical and gynecological services at their practice, including family planning services, pap smears, obstetrical care, gynecological procedures and surgeries, screening for and treatment of sexually transmitted infections, abortion services, treatment of menopausal symptoms, and infertility treatments.   The gynecological surgeries performed by Drs. Hodes and Nauser at their office include endometrial ablation, tubal ligation, diagnostic hysteroscopy and surgical completion of miscarriage.

11.      Drs. Hodes' and Nauser's practice accepts all major forms of health insurance in the area, including private insurance plans, Medicaid, and Medicare.

12.     Drs. Hodes and Nauser also provide hospital-based care to their patients who need services in that setting.  Their hospital-based services include obstetrical and gynecological surgeries and delivering babies.

13.     Drs. Hodes and Nauser regularly provide five or more first-trimester abortions a month, and second trimester abortions, that do not fall under the medical emergency exception contained in the Act.  Their practice has offered such abortion services in the same physical facility for over 25 years.  That facility meets the applicable standards of care, the existing Kansas regulations governing providers of office-based surgery, Kan. Admin. Regs. § 100-25-1 *et seq.*, and the clinical standards of the National Abortion Federation, a professional association for physicians and facilities providing abortions, of which Plaintiffs are members.  The Practice is already subject to oversight and inspections by the Kansas Board of Healing Arts, KDHE (to the extent it administers, in Kansas, the federal Clinic Laboratory Improvement Amendments, governing laboratory testing), and the National Abortion Federation.

14.     Plaintiffs perform approximately one-quarter of the total abortions reported in the State annually.  *See* Kansas Dep't of Health & Environment – Abortions in Kansas 2010 (Preliminary Report), *available at* http://www.kdheks.gov/hci/abortion_sum/2010itop1.pdf (last visited June 26, 2011) (providing total number of reported abortions performed in the State). The vast majority of these abortions are performed in the first trimester of pregnancy.

15.     Plaintiffs perform a significant number of abortions in situations where the woman has been diagnosed with a medical complication or condition and/or where the fetus has been diagnosed with a serious fetal anomaly.  Many of the perinatology practices in the region refer their patients who seek terminations after receiving a diagnosis of fetal anomaly to Plaintiffs.  Additionally, other outpatient abortion providers in the region also regularly refer

patients to Plaintiffs when the woman has been diagnosed with a medical complication or condition (e.g. hypertension, obesity, fibroids, uterine anomaly, moderately low hemoglobin, placenta previa).  Upon information and belief, these referrals are made based on the referring providers' confidence in Dr. Hodes' and Dr. Nauser's ability to provide expert, high-quality care to patients in those circumstances.

16.     Plaintiffs bring this action on their own behalf and on the behalf of their patients who seek abortion services presently or in the future.

**B. Defendants**

17.     Defendant Robert Moser, M.D., is the Secretary of KDHE, the agency responsible for promulgating regulations under the Act, enforcing its licensing requirements, and determining violations thereunder.  Act, at secs. 9, 6, 2. Secretary Moser is sued in his official capacity, as are his agents and successors.

18.     Defendant Stephen Howe is the District Attorney for Johnson County, Kansas, in which the Practice is located. As District Attorney, Defendant Howe has the authority to prosecute violations of the Act occurring in Johnson County.  *See* Kan. Stat. Ann. § 22a-104 (district attorney duties); Kan. Stat. Ann. § 22-2602 (place of trial).  District Attorney Howe is sued in his official capacity, as are his agents and successors.

19.     Defendant Derek Schmidt is the Attorney General for the State of Kansas.  As Attorney General, Defendant Schmidt is the "chief law enforcement officer of the state" and "one of the state's prosecuting attorneys."  *State v. Rohleder*, 208 Kan. 193, 194 (1971); Kan. Stat. Ann. § 22-2202(17).  The Attorney General may assist a county attorney in the prosecution of a case and may take over the prosecution of such a case upon the county attorney's request.

State v. Reynolds, 234 Kan. 574, 578-79 (1984).  Defendant Schmidt is sued in his official capacity.

## V. Factual Allegations

### A. Abortion Services

20.     Legal abortion is one of the safest procedures in contemporary medical practice. At earlier gestational ages, abortion is significantly safer than carrying a pregnancy to term. Until the end of the second trimester, abortion is equally safe as carrying a pregnancy to term.

21.     Women seek abortions for a variety of reasons, including psychological, emotional, medical, familial, social and economic.

22.     The vast majority of abortions in this country, including those in Kansas, are performed in the first trimester of pregnancy.

23.     Abortions may be performed by surgical or medical means.  Medication abortion involves the administration of medications (in the form of pills) to induce an abortion.  Surgical abortion involves the use of instruments to evacuate the contents of the uterus.  Surgical abortion is short in duration (a first trimester abortion typically takes about five to eight minutes) and involves no incision into the woman's body.

24.     Both surgical abortion and medication abortion are analogous to a number of other outpatient procedures in terms of risks, invasiveness, instrumentation, and duration.  For example, first trimester surgical abortion is essentially the same procedure as surgical completion of miscarriage (a procedure performed when a women has experienced a spontaneous miscarriage but has not completely expulsed the contents of the uterus), which is also commonly performed in medical offices and other outpatient settings.  Other analogous gynecological procedures performed in such settings include diagnostic dilation and curettage, endometrial

biopsy, and hysteroscopy.  Analogous non-gynecological outpatient procedures performed in such settings include vasectomy, sigmoidoscopy and operative colonoscopy.

25.     There is no medical basis for requiring that offices and clinics in which abortions are performed meet standards and requirements different from those in which analogous medical procedures are performed.

26.     Although abortion is a very safe procedure, the risks of an abortion procedure increase with the duration of the pregnancy. Therefore any delay in obtaining an abortion may cause increased risk of morbidity (major complications) and mortality (death) for the patient.

27.     Upon information and belief, there are only three medical facilities in the State of Kansas that regularly provide abortions: the Practice; a medical clinic in Kansas City, which was recently denied a license under the Act by KDHE; and Comprehensive Health Center, an ambulatory surgical center operated by Planned Parenthood of Kansas and Mid-Missouri, which Plaintiffs believe has been inspected but not granted a license by KDHE.  The closest out-of-state provider is a Planned Parenthood clinic in Columbia, Missouri that offers only limited first-trimester abortion services.   The closest out-of-state provider of second-trimester abortion services is a Planned Parenthood clinic in St. Louis, Missouri.  On information and belief, no other physician in Kansas or any neighboring state provides abortions as part of a broader, office-based medical practice.

**B .  The Act**

28.     On May 16, 2011, S.B. 36 was enacted into law. The Act takes effect upon publication in the statute book, which is expected to occur on July 1, 2011.  The Act makes it unlawful to operate an "abortion clinic" in the state without possessing a valid license issued by the Department pursuant to the Act.   Act, at sec. 8(a).  There is no *mens rea* requirement for that

crime.  *Id.*  Violation of this requirement is a Class A nonperson misdemeanor, Act, at sec. 8(c), punishable by one year of imprisonment and up to $2,500 in fines,  Kan. Stat. Ann. § 21-4502(1)(A);  Kan. Stat. Ann. § 21-4503(c)(1).  Conviction of a Class A misdemeanor can give rise to the suspension, limitation, or revocation of a medical license by the Kansas Board of Healing Arts. Kan. Stat. Ann. § 65-2836(c). Violation of the Act's licensing provision also constitutes unprofessional conduct under Kan. Stat. Ann. § 65-2837(b), which can lead to suspension, limitation or revocation of a doctor's medical license by the Board of Healing Arts as well. Act, at sec. 8(c); Kan. Stat. Ann. § 65-2836(b).

29.     The Act authorizes KDHE to license, inspect, and impose penalties on facilities subject to the Act. Act, at sec. 2-3, 5-6.  With respect to licensing, the Act requires KDHE to issue a license to any facility that submits an application and meets all applicable laws and rules and regulations.  Act, at sec. 2(c).

30.     The Act also requires KDHE to adopt rules and regulations for the licensure of facilities that perform abortions. Act, at sec. 9.  The rules and regulations adopted by KDHE under the Act must address "sanitation, housekeeping, maintenance, staff qualifications, emergency equipment and procedures to provide emergency care, medical records and reporting, laboratory, procedure and recovery rooms, physical plant, quality assurance, infection control, information on and access to patient follow-up care and any other areas of medical practice needed to carry out the purpose of [the Act]." *Id.*

31.     The Act provides no deadline for when the rules and regulations under the Act must be adopted by KDHE; nor does the Act require or mention the adoption of temporary regulations.

32.     Because the Act authorizes licensing on the basis of "applicable" laws, and imposes no deadline for the promulgation of regulations under the Act, KDHE could have provisionally licensed regulated facilities on the basis of their compliance with existing law and waited to apply new regulations until there had been adequate opportunity for notice and comment on them. KDHE could also have imposed flexible minimum standards in the Temporary Regulations especially as to the physical facility requirements.

### C. The Licensing Process

33.     On May 17, 2011, the day after the Act was signed into law, Plaintiffs, through counsel, wrote a letter to KDHE pointing out that insufficient time existed for the agency to both promulgate regulations and give providers a reasonable opportunity to comply with those regulations prior to the effective day of the Act.  The letter therefore suggested that KDHE grant provisional licenses on the basis of compliance with existing law while the agency worked to develop regulations.  [A true and correct copy of the letter is attached hereto as Exhibit C].

34.     KDHE did not respond to Plaintiffs' letter until May 26, 2011, at which point the agency informed Plaintiffs that it planned to issue temporary regulations, inspect clinics, and make licensing decisions on or by the July 1st effective date of the bill.  [A true and correct copy of the letter is attached hereto as Exhibit D].  At that point, Plaintiffs had not seen any draft of the temporary regulations.

35.     On June 9, 2011, KDHE sent Plaintiffs a draft of the temporary regulations ("Draft Regs") which comprised more than 30 pages, as well as a license application form and cover letter.  [A true and correct copy of the letter and enclosures is attached hereto as Exhibit E].

36.    KDHE's letter instructed Plaintiffs to complete the application form and return it, along with an application fee and "written verification of compliance with all local codes and ordinances, fire codes and regulations, and arrangements for the removal of biomedical waste and human tissue" by June 17, 2011.   The application form included a checklist requiring the facility to indicate that it met the statutory requirements in each of the enumerated areas.   Thus, Plaintiffs were given six business days to review the draft regulations for the first time, affirm that they complied with all of the statutory requirements (which had been interpreted in the draft regulations), and gather the required materials, including documentation of their compliance with local codes and ordinances.

37.    The June 9th draft of the temporary regulations included extensive requirements for all aspects of the medical facility, including staffing, procedures, equipment, and physical environment.   With respect to the physical facility, the June 9th draft specified particular rooms and areas required in the facility, but it did not mandate the dimensions of those rooms and areas or their precise location within the facility.   Ex. E, Draft Regs. § 28-4-133(b).   With respect to patient recovery time, the June 9th draft required that the facility specify, in accordance with "the usual standards of medical practice," a minimum length of time for a patient to remain in the recovery room based on the type of abortion procedure, gestational age of the pregnancy, and the post-procedure condition of the patient. Ex. E, Draft Regs. § 28-34-139(1).

38.    On June 13, 2011, KDHE sent a letter to Plaintiffs informing them that the June 9th draft of the temporary regulations had been changed by the Office of the Kansas Attorney General.   KDHE did not at that time provide a copy of the revised regulations, or indicate what changes had been made, but it indicated that it would send them a revised version in the future. [A true and correct copy of the letter is attached hereto as Exhibit F].

39.     On Friday, June 17, 2011, after the close of business, KDHE sent Plaintiffs a copy of the revised regulations, indicating that this was the final version of the temporary regulations ("Temporary Regulations").  [A true and correct copy of that correspondence is attached hereto as Exhibit G; *see also*, the Temporary Regulations, at Exhibit B].  Plaintiffs received the Temporary Regulations on the morning of Monday, June 20, 2011.

40.     The Temporary Regulations are similar to the June 9th draft in a number of respects; in other respects, they impose far more rigid and onerous requirements.

41.     As a whole, the Temporary Regulations impose burdensome and costly requirements that are not medically necessary or appropriate, and that are not imposed on Kansas medical providers performing other comparable procedures.

42.     For example, the Temporary Regulations impose numerous physical facility requirements that are difficult or impossible for a medical office to meet, and that are not necessary for the provision of abortion services.  These physical facility requirements were made significantly more onerous after the initial draft regulations were changed by the Attorney General's office.   The medically unnecessary physical environment regulations include requirements that the facility have: procedure rooms of at least 150 square feet in size, Kan. Admin. Regs. § 28-34-133(b)(7); janitorial storage space of a size at least equivalent to 50 square feet per procedure room (i.e., a facility with 6 procedure rooms must have 300 sq. ft. of janitorial storage), Kan. Admin. Regs. § 28-34-133(b)(15); designated patient dressing rooms with a toilet, hand-washing station and storage for clothing and valuables, Kan. Admin. Regs. § 28-34-133(b)(2); designated staff dressing rooms with a toilet, hand-washing station and storage for clothing and valuables, Kan. Admin. Regs. § 28-34-133(b)(3); separate sets of toilet facilities specifically designated for use by patients, staff and the public, Kan. Admin. Regs. § 28-34-

133(b)(5); a toilet room that is adjacent to (not just accessible from) the area in which a patient recovers, Kan. Admin. Regs. § 28-34-133(b)(4); "separate facilities" for pre-procedure hand washing (as opposed to hand-washing facilities located in the procedure rooms), Kan. Admin. Regs. § 28-34-133(b)(6); separate soiled and clean workrooms for cleaning and sterilizing used instruments, and two separate sinks in the soiled (rather than just separate clean and soiled areas within one workroom containing one sink), Kan. Admin. Regs. § 28-34-133(b)(13)-(14).

43.     The Temporary Regulations also require that every abortion patient remain in the recovery area for at least two hours after her abortion, regardless of the type of abortion procedure, the gestational age of the pregnancy, or the patient's post-procedure condition. Kan. Admin. Regs. § 28-34-139(1).  This rigid and medically inappropriate requirement was added to the regulations after the Attorney General made changes to the first draft.

44.     The Temporary Regulations also require regulated facilities to possess unnecessary and inappropriate equipment and supplies, including pediatric-sized ventilation masks, cannulas, pulse oximeter sensors, defibrillator paddles, and EKG electrode skin contacts. Kan. Admin. Regs. § 28-34-135(c)(3), (8), (e)(1), (f) (2), (3), (4).  Plaintiffs do not have child-aged patients, do not deliver babies in their office, and only perform abortions there prior to fetal viability.

45.     The Temporary Regulations impose a number of ambiguous and unclear requirements, such as requiring Plaintiffs to report "to the appropriate licensing agency" any incident that could "provide possible grounds for disciplinary action by the appropriate licensing agency," Kan. Admin. Regs. § 28-34-142(f)(1)(d), (f)(2), and to "make all reasonable efforts to ensure that [an abortion patient] returns for a subsequent examination," Kan. Admin. Regs. § 28-

34-141(d).   This latter provision makes no indication of whether the reasonableness of a provider's efforts will be judged by a subjective or objective standard.

46.     The Temporary Regulations impose more stringent requirements than those imposed by the State on providers of comparable medical procedures.   Moreover, in many respects (including the physical facility requirements), the Temporary Regulations impose more stringent requirements than those imposed on providers that perform much more complex and risky procedures, such as hospitals and ambulatory surgical centers.

47.     Despite the fact that it would be extremely costly, if not impossible, for Plaintiffs to bring their facility into compliance with the Temporary Regulations, and thus to continue providing abortions to their patients, KDHE issued an economic impact statement on June 20, 2011, that concluded that the temporary regulations "should not impose any unusual cost on regulated providers or consumers of provider services."   [A true and correct copy of the statement is attached hereto as Exhibit H].

48.     On June 21, 2011, the day after Plaintiffs received the Temporary Regulations, they received notice from KDHE indicating that their inspection was scheduled for June 27, 2011, six days later.  [A true and correct copy of the email is attached hereto as Exhibit I].

49.     The notice indicated that any change in that inspection date by Plaintiffs would require 30 days' advance notice.

50.     On that same date, Plaintiffs wrote to KDHE, informing KDHE that they could not meet a number of the physical facility regulations that had been added in the revised version of the Temporary Regulations, and asking whether KDHE would entertain requests for waivers of any of those requirements.  They further asked KDHE whether it would grant a provisional

license while it considered any such waiver requests.  [A true and correct copy of the email is attached hereto as Exhibit J].

51.     KDHE responded that same day, stating that it would not consider any waiver requests and would not grant provisional licensing. [A true and correct copy of the email is attached hereto as Exhibit K].

52.     At that point, Plaintiffs wrote to KDHE to indicate that, in light of the new requirements, they could not be ready for inspection by June 27, 2011; they therefore requested that their inspection be moved to June 29, 2011. [A true and correct copy of the email is attached hereto as Exhibit L].

53.     KDHE agreed to change Plaintiffs inspection date to June 29, 2011, but stated that as a result Plaintiffs might not be able to complete the licensing process by July 1, 2011. [A true and correct copy of the email is attached hereto as Exhibit M].

**D.  Application of the Temporary Regulations to the Practice**

54.     Plaintiffs cannot bring their existing office and practice into compliance with the Temporary Regulations prior to July 1, 2011, if ever. They simply do not have additional space in their building to meet the new requirements.

55.     Plaintiffs use six procedure rooms in their busy ob-gyn practice; none of those rooms are 150 sq. ft. in size, and a room of that size is not medically necessary for abortions or any of the other procedures Plaintiffs perform.

56.     Plaintiffs' office does not have anywhere near the required 300 sq. ft. of janitorial storage, and that amount of space is unnecessary for the safe performance of abortions and the other procedures they perform or the supplies necessary to keep the office clean.

57.     Plaintiffs' office does not have designated patient dressing rooms; rather, a patient changes in the privacy of the procedure room in which she will undergo her procedure.   The patient's clothes and valuables stay in the same room as the patient throughout the time she is in the facility.   There is no medical basis for requiring such dressing rooms in medical practices that perform abortions.

58.     Plaintiffs' office does not have designated staff dressing rooms; rather, the staff comes to work dressed, and if a staff member needs to change for any reason, he or she does so in an unoccupied room. There is no medical basis for requiring such dressing rooms in medical practices that perform abortions.

59.     Plaintiffs' office patients recover in the privacy of the procedure room in which they underwent their procedures; a patient's recovery is monitored by a member of the staff present in the patient's room.   A toilet room is accessible to patients recovering in procedure rooms, but is not located directly adjacent to the procedure rooms. Recovery time after an abortion is short, and patients are ambulatory shortly after the procedure and are able to walk to a bathroom if needed.

60.     Plaintiffs' office does not have a separate pre-procedure hand-washing area; rather, Plaintiffs wash their hands in the hand-washing sink in each procedure room.  No separate "scrub area" is needed in this setting because an abortion is performed in a clean space, but not a sterile space.  This is because surgical abortion, like any other gynecological procedure in which instruments are introduced through the vagina, is not a sterile procedure – the sterile instruments cease to be sterile once they enter the vagina.   Thus, the procedure rooms at Plaintiffs' practice are unlike a hospital operating theater, and medical personnel can wash their hands within the procedure rooms.

61.     Plaintiffs' office has one workroom, with separate "soiled" and "clean" areas and one sink, for cleaning and sterilizing instruments after use.   There is no medical basis for requiring that these areas or functions be contained in separate rooms, or that the workroom contain more than one sink.

62.     After an abortion at Plaintiffs' office, a patient remains in her private procedure room under the monitoring of a staff member until such time as she meets Plaintiffs' discharge criteria.   The patient's recovery time depends on such factors as the length of the pregnancy, the course of the procedure, and the patients' overall health condition.   The vast majority of Plaintiffs' abortions patients meet the discharge criteria and are ready to go home well under an hour after the procedure.   It is medically unnecessary and burdensome to the patient to try to force her to remain in recovery after she has met appropriate discharge criteria and is ready to go home.   Keeping patients in the facility and under staff supervision for this unnecessary length of time will also greatly impair Plaintiffs ability to schedule and see patients, as their rooms will be occupied by patients who do not need them.

63.     Had Plaintiffs been afforded the opportunity to comment on the Temporary Regulations, or seek waivers from particular physical facility regulations, they would have explained to KDHE that many of the regulatory requirements are medically unnecessary and unduly rigid; they would have shown KDHE that medical offices can meet the applicable standards of care and provide high-quality, safe health services without complying with these medically unnecessary and rigid requirements; and they would have provided KDHE with evidence of the negative impact that the Temporary Regulations and Licensing Process would have on their patients' health, specifically, and the public health generally.

64.     The Temporary Regulations and Licensing Process will force Plaintiffs to cease providing virtually all abortion services in the Practice.

65.     On June 28, 2011, Plaintiffs cancelled their inspection because it was apparent that they could not comply with the physical plant requirements as written, and that KDHE would grant no waivers or provisional licenses, or make any accommodations for existing facilities.  Taking a further step in KDHE's unconstitutional licensing process would only have resulted in a license denial, which would have tarnished Plaintiffs' reputations and permanent records for purposes of future professional credentialing and licensing.  Thus, Plaintiffs' only avenue of recourse for continuing to provide abortion services to their patients and protecting their practice was to file a lawsuit.

66.     On information and belief, KDHE adopted and implemented the Temporary Regulations and Licensing Process in the ways described herein because of political pressure from the current State administration to close abortion clinics by any means necessary.

**E. Harms Imposed by the Temporary Regulations and Licensing Process**

67.     Enforcement of the Temporary Regulations and Licensing Process will force Plaintiffs to cease their ongoing provision of abortion services in their practice, thereby unjustifiably delaying Plaintiffs' patients in obtaining abortions.

68.     At the present time, these delays are exacerbated by the fact that Plaintiffs do not know of a single licensed abortion provider in the entire State to whom Plaintiffs can refer their patients.

69.     The delays caused by the Temporary Regulations and Licensing Process will expose Plaintiffs' patients to unnecessary health risks.

70.     Even if one or more of the other abortion providers in the State were able to become licensed, the application of the Temporary Regulations and Licensing Process to Plaintiffs would still cause significant delays for their patients seeking abortion who have complicating medical conditions and/or have received a diagnosis of fetal anomaly.  Plaintiffs do not know of any other provider in the surrounding area to whom they can refer these patients.

71.     Even if one or more of the other abortion providers in the State were able to become licensed, the application of the Temporary Regulations and Licensing Process to Plaintiffs would still leave Kansas women unable to obtain, or greatly hindered in trying to obtain, abortion services in a private medical office setting.  Such a setting is preferred by some patients because it can be less cumbersome and stressful to obtain a medical procedure in that setting than in a hospital or ambulatory surgical center; because the patient already has a relationship with the physician in that setting; or because the patient can more conveniently use her health insurance in that setting.  Plaintiffs know of no other physician in the area who provides abortions as part of a private medical practice, and to whom they could refer their patients if injunctive relief is not issued.

72.     Enforcement of the Temporary Regulations and Licensing Process will cause immediate and irreparable harms to Plaintiffs' medical practice.  These harms include loss of revenues, loss of future patients, and damage to Dr. Hodes' and Dr. Nauser's professional standing among their colleagues, patients, and potential patients.

73.     By imposing medically unnecessary burdens on the provision of abortion services, the Temporary Regulations and Licensing Process will cause immediate and irreparable harms to public health.

**F. Lack of Harm from Maintaining the Status Quo**

74.     Delaying enforcement of the Temporary Regulations and Licensing Process during the pendency of this lawsuit will not create any risk of harm to women in Kansas because the Temporary Regulations and Licensing Process are not designed to protect women's health and will not have the effect of protecting women's health; to the contrary, by imposing unnecessary requirements and impeding access to safe and legal abortion services, they will harm women's health.

75.     While the Temporary Regulations and Licensing Process are enjoined, Plaintiffs will remain subject to inspections, regulation and oversight by the Kansas Board of Healing Arts, just like other medical offices that provide comparable services.

## FIRST CLAIM FOR RELIEF (Patients' Right to Privacy)

76.     Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 75 above.

77.     The Temporary Regulations and Licensing Process have the purpose and the effect of imposing an undue burden on Plaintiffs' patients who seek abortions presently or in the future, in violation of the Fourteenth Amendment to the United States Constitution.

## SECOND CLAIM FOR RELIEF (Plaintiffs' Right to Procedural Due Process)

78.     Plaintiffs hereby re-allege and incorporate by references paragraphs 1 through 77 above.

79.     The Temporary Regulations and Licensing Process violate Plaintiffs' right to procedural due process under the Fourteenth Amendment to the United States Constitution because they deprive Plaintiffs of protected property and liberty interests without providing Plaintiffs with any form of pre-deprivation hearing, including any opportunity to comment on the regulations or request waivers from KDHE.

### THIRD CLAIM FOR RELIEF (Plaintiffs' Right to Substantive Due Process)

80.     Plaintiffs hereby re-allege and incorporate by references paragraphs 1 through 79 above.

81.     The Temporary Regulations and Licensing Process violate Plaintiffs' right to due process of law under the Fourteenth Amendment to the United States Constitution by:  depriving them of property (including lost income and future patients) and liberty (including their ability to practice their profession) without serving any compelling, substantial, or legitimate state interest.

### FOURTH CLAIM FOR RELIEF (Plaintiffs' Right to Due Process - Vagueness)

82.     Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 81 above.

83.     The Temporary Regulations and Licensing Process violate Plaintiffs' right to due process of law under the Fourteenth Amendment to the United States Constitution by failing to give Plaintiffs fair notice of the requirements they must meet under the Temporary Regulations and encouraging arbitrary and discriminatory enforcement of those regulations.

### FIFTH CLAIM FOR RELIEF  (Plaintiffs' Right to Equal Protection)

84.     Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 83 above.

85.     The Temporary Regulations and Licensing Process deprive Plaintiffs of equal protection of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution, by subjecting them to unique burdens not imposed on medical practices that provide comparable services, with no basis for the differential treatment other than animus.

### REQUEST FOR RELIEF

WHEREFORE Plaintiffs request that this Court:

1.     Issue a declaratory judgment that the Temporary Regulations (to be codified at Kan. Admin. Regs. § 28-34-126 - 44 (2011)) and the licensing requirements of the Act (Senate Bill No. 36 (2011), at sec. 2, 8) as applied by KDHE through its adoption and implementation of the Temporary Regulations violate rights of Plaintiffs and their patients protected by the Fourteenth Amendment to the United States Constitution;

2.     Issue preliminary and permanent injunctive relief, without bond, restraining Defendants from: (a) enforcing the Temporary Regulations; and (b) enforcing the licensing requirements of the Act (Senate Bill No. 36 (2011), at sec. 2, 8) until such time as KDHE has implemented constitutionally adequate licensing procedures.

3.     Grant Plaintiffs attorney's fees, costs and expenses pursuant to 42 U.S.C. § 1988; and

4.     Grant such other and further relief as this Court deems just and proper.

**Place of Trial**

Plaintiffs respectfully request that the trial of this matter be held in Kansas City, Kansas.

Respectfully submitted, this 28th day of June, 2011,

  _/S/ Teresa Woody_____

| | |
|---|---|
| Teresa Woody, KS Bar #16949 | Bonnie Scott Jones* |
| The Woody Law Firm PC | Kara Loewentheil* |
| 1621 Baltimore Ave. | Center for Reproductive Rights |
| Kansas City, MO 64108 | 120 Wall Street, 14th Floor |
| (816) 421-4246 Phone | New York, NY 10005 |
| (816) 471-4883 Fax | (917) 637-3600 |
| teresa@woodylawfirm.com | (917) 637-3666 Fax |
| | bjones@reprorights.org |
| | kloewentheil@reprorights.org |
| | *Motion for Admission *Pro Hac Vice* to be filed |

ATTORNEYS FOR PLAINTIFFS