## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| HODES & NAUSER, M.D.'s , P.A., | ) | |
| HERBERT C. HODES, M.D., and | ) | |
| TRACI LYNN NAUSER, | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| and | ) | Case No. 11-2365-CM-KGS |
| | ) | |
| CENTRAL FAMILY MEDICAL,  LLC, | ) | |
| dba  AID FOR WOMEN, and | ) | PLACE OF TRIAL REQUESTED: |
| RONALD N. YEOMANS, M.D., | ) | KANSAS CITY, KANSAS |
| | ) | |
| Plaintiffs/Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT MOSER, M.D., in his official capacity | ) | |
| as Secretary of the Kansas Department of Health | ) | |
| and Environment; JEROME GORMAN, in his | ) | |
| official capacity as District Attorney for | | |
| Wyandotte County; and DEREK SCHMIDT, in | | |
| his official capacity as Attorney General for the | | |
| State of Kansas, | | |
| | | |
| Defendants. | | |

## FIRST AMENDED INTERVENOR COMPLAINT OF
## CENTRAL FAMILY MEDICAL AND RONALD YEOMANS, M.D.

Plaintiffs Central Family Medical, LLC, dba Aid for Women, and Ronald Yeomans,

M.D. (collectively "Plaintiff-Intervenors" or "Plaintiffs"), by and through their undersigned

counsel, bring this First Amended Intervenor Complaint against the above-named Defendants,

their employees, agents, and successors in office ("Defendants").   Plaintiff-Intervenors file this

Complaint simultaneously with their motion to intervene and their request for expedited consideration.  For their claims against Defendants, Plaintiffs state the following:

## I. Preliminary Statement

1.        This is an action under the United States Constitution and 42 U.S.C. § 1983 brought by a private abortion clinic and the physician who provides services at that clinic challenging the constitutionality of the licensing provisions of Kansas Senate Bill No. 36 (2011) ("Act"),  Act, at sec. 2, 8,  as applied by Defendant Secretary Moser of the Kansas Department of Health and Environment ("KDHE") through a sham licensing scheme aimed not at improving the health or safety of women but designed solely with the goal of denying licenses to lawfully operating abortion providers. The KDHE promulgated onerous and medically unnecessary regulations ("Temporary Regulations") without giving regulated persons and entities notice or an opportunity to be heard.  The KDHE has required near-overnight compliance with detailed regulations that will require building renovations that are costly and medically unnecessary. Significantly, the KDHE has denied Plaintiffs' Clinic, Aid for Women, a license without even inspecting Plaintiffs' clinic and without identifying any deficiencies and without providing any opportunity to correct any alleged deficiencies.  The KDHE, through Secretary Moser,  imposed absurdly short deadlines for compliance with the new regulations, which imposed a host of unnecessary rules about such things as the location of restrooms, the size of the recovery room, and the size of janitorial storage areas.[1] When the Act and Temporary Regulations take effect on July 1, 2011, Plaintiffs, and other clinics and medical practices, will be prohibited from performing virtually all abortions[2] in their medical offices unless they bring those offices into

---

[1] A true and correct copy of the regulations, which are to be codified at Kan. Admin. Regs. § 28-34-126 - 44 (2011), is attached to the Complaint of Dr. Hodes and Dr. Nauser.  A copy of the statute is also attached to their Complaint.
[2] The Act applies to any facility that performs five or more first-trimester abortions in a month, or any second or third trimester abortions, excluding abortions performed due to a medical emergency. The Act defines a "medical

compliance with the Temporary Regulations, Act, at sec. 1(f), 2(a), which Plaintiffs received just nine business days before the effective date.

2.      At every step of the challenged process, KDHE implemented the licensing provisions of the Act in ways that made it impossible for existing clinics or medical practices to obtain a license by the effective date:  (a) KDHE drafted and finalized Temporary Regulations without giving the facilities to be regulated any opportunity to comment on the regulations, despite the lack of any urgent circumstances necessitating that course of action; (b) KDHE included in the Temporary Regulations medically unnecessary, burdensome and inappropriate requirements, such as rigid specifications as to the number, type and dimensions of rooms in the facility, that cannot possibly be achieved in a matter of weeks; (c) KDHE conditioned licensure upon *immediate* compliance with the Temporary Regulations, which were not sent to abortion providers until after the close of business on June 17, 2011, less than two weeks before the Act was to take effect; and (d) KDHE refused to consider waiver requests, provisional licensing, or any other accommodations for existing facilities.

3.      For many years, Plaintiffs have provided safe, high-quality abortion services in the Central Family Medical Clinic, which operates as Aid for Women in a facility at 7th Street and Central in Kansas City, Kansas (hereafter the "Clinic").   The clinic meets the needs of their patients, the applicable standards of care, and the existing state regulations.  Nonetheless, the Clinic cannot satisfy all of the detailed and medically unnecessary requirements of the Temporary Regulations, and it is impossible to bring the facility into full compliance by the

emergency" as "a condition that, in a reasonable medical judgment [sic], so complicates the medical condition of the pregnant woman as to necessitate the immediate abortion of her pregnancy without first determining gestational age in order to avert her death, or for which a delay necessary to determine gestational age will create serious risk of substantial and irreversible physical impairment of a major bodily function." Act, at sec. 1(i). The Act specifies that a medical emergency does *not* include a situation in which there is a "claim or diagnosis that the woman will engage in conduct which would result in her death or in substantial and irreversible physical impairment of a major bodily function." *Id.*

effective date.   Accordingly, in the absence of relief from this Court, beginning on July 1, 2011, Plaintiffs-Intervenors will be forced to stop providing virtually all abortion services in the Clinic, causing irreparable harm to the Clinic and Dr. Yeomans and to the health and well-being of their patients seeking abortions.  The necessity of relief here is particularly urgent as Plaintiffs here provide a safe and needed service to a primarily low-income clientele, whose options for seeking abortions elsewhere are limited. Aid for Women is the only abortion provider in Wyandotte County, and draws its patients largely from nearby geographic areas. Plaintiffs-Intervenors therefore seek temporary, preliminary and permanent injunctive relief against the Temporary Regulations and the licensing requirements of the Act as applied by KDHE through its adoption and implementation of the Temporary Regulations (referred to herein as the "Licensing Process").  Such injunctive relief is necessary to prevent irreparable harms and the violation of rights secured to Plaintiffs and their patients by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**II. Jurisdiction and Venue**

4.    This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

5.    Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202.

6.    Venue in this court is proper under 28 U.S.C. 1391(b) because a substantial part of the events giving rise to this action occurred in this district.

**III. Parties**

    **A. Plaintiffs-Intervenors**

7.      Plaintiff Central Family Medical, LLC, operates under the name Aid for Women and has provided abortion services in Kansas City, Kansas for 28 years.  For the past 21 years, it has operated in the same building located at 7th and Central.

8.      Plaintiff Ronald Yeomans, M.D., is board certified in obstetrics and gynecology and has been so certified since 1975.  He received his medical degree from the University of Kansas Medical School in 1967.  He interned at Wesley Medical Center in Wichita and served his residency at the University of Kansas Medical Center from 1970 to 1973.

9.      Dr. Yeomans has active licenses to practice medicine in Kansas, Missouri and Indiana.  In past years, he has been affiliated with Olathe Community Hospital and Shawnee Mission Medical Center.

10.     Dr. Yeomans first began performing abortions during his residency at the University of Kansas Medical Center.  He has provided abortions in a variety of settings for more than 35 years.  Since February 2006, he has provided abortion services at the Aid for Women Clinic.

11.     Dr. Yeomans is a member of the American College of Obstetrics and Gynecology, the National Abortion Federation and the Association of Reproductive Health Professionals.  He stays up to date in training and education through a variety of courses made available through the American Medical Association.  Dr. Yeomans has had clinical privileges at various hospitals in past years, but has had no need of them in recent years as his practice is restricted to first trimester abortions in an office setting.  However, he now has an application for clinical privileges pending at a hospital located a short distance from the Clinic and expects privileges to be granted imminently.

12.     The Aid for Women Clinic serves primarily a low-income clientele. Approximately 50 percent, or a little more, of the Clinic's patients are African American or Latino; the remaining patients are Caucasian and a significant number are from small cities or rural areas.  A suspension or cessation of service at the Clinic would impose a great hardship on the women who seek abortion services at the Clinic, whose economic choices are limited and who often lack funds to travel any significant distance to obtain medical care.

13.      The Aid for Women clinic has offered such abortion services in the same physical facility for over 21 years without any difficulties.   The facility meets the applicable standards of care, the existing Kansas regulations governing providers of office-based surgery, Kan. Admin. Regs. § 100-25-1 *et seq.*, and the clinical standards of the National Abortion Federation, a professional association for physicians and facilities providing abortions, of which Plaintiffs are members.  The Practice is already subject to oversight and inspections by the Kansas Board of Healing Arts, KDHE (to the extent it administers, in Kansas, the federal Clinic Laboratory Improvement Amendments, governing laboratory testing), and the National Abortion Federation.

14.     Plaintiffs perform approximately 100 to 120 abortions per month at the Clinic. All of these abortions are done in the first trimester, up to 15 weeks from the last menstrual period.   Approximately 90 percent of the abortions are very early abortions, and are performed at less than 12 weeks of pregnancy.

15.     The women who obtain abortion services at Aid for Women do so for a variety of reasons.  The vast majority are low-income.  Many are single parents or have lost their jobs.  A significant number have no supportive male partner, or have been the victims of rape or abuse. Some suffer from physical or mental conditions that imperil their health or well being.

16.     Plaintiffs bring this action on their own behalf and on the behalf of their patients who seek abortion services presently or in the future.

**B. Defendants**

17.     Defendant Robert Moser, M.D., is the Secretary of KDHE, the agency responsible for promulgating regulations under the Act, enforcing its licensing requirements, and determining violations thereunder.  (Act, at secs. 9, 6, 2). Secretary Moser is sued in his official capacity, as are his agents and successors.

18.     Defendant Jerome Gorman is the District Attorney for Wyandotte County, Kansas, where the Aid for Women Clinic is located.  As District Attorney, Defendant Gorman has the authority to prosecute violations of the Act occurring in Wyandotte County.  *See* Kan. Stat. Ann. § 22a-104 (district attorney duties); Kan. Stat. Ann. § 22-2602 (place of trial).  District Attorney Gorman is sued in his official capacity, as are his agents and successors.

19.     Defendant Derek Schmidt is the Attorney General for the State of Kansas.  As Attorney General, Defendant Schmidt is the "chief law enforcement officer of the state" and "one of the state's prosecuting attorneys."  *State v. Rohleder*, 208 Kan. 193, 194 (1971); Kan. Stat. Ann. § 22-2202(17).  The Attorney General may assist a county attorney in the prosecution of a case and may take over the prosecution of such a case upon the county attorney's request. State v. Reynolds, 234 Kan. 574, 578-79 (1984).  Defendant Schmidt is sued in his official capacity.

**V. Factual Allegations**

**A. Abortion Services**

20.     Legal abortion is one of the safest procedures in contemporary medical practice. At earlier gestational ages, abortion is significantly safer than carrying a pregnancy to term.

Until the end of the second trimester, abortion is equally safe as carrying a pregnancy to term. The earliest abortions – at less than 12 weeks from the last menstrual period – are the safest of all abortions and are simply and easily performed in an office setting.

21.     Women seek abortions for a variety of reasons, including psychological, emotional, medical, familial, social and economic.

22.     The vast majority of abortions in this country, including those in Kansas, are performed in the first trimester of pregnancy.  Ninety percent of the abortions performed at Aid for Women are at less than 12 weeks from the woman's last menstrual period.

23.     Abortions may be performed by surgical or medical means.  Medication abortion involves the administration of medications (in the form of pills) to induce an abortion.  Surgical abortion involves the use of instruments to evacuate the contents of the uterus.  Surgical abortion is short in duration (a first trimester abortion typically takes about five to eight minutes) and involves no incision into the woman's body.

24.     Both surgical abortion and medication abortion are analogous to a number of other outpatient procedures in terms of risks, invasiveness, instrumentation, and duration.  For example, first trimester surgical abortion is essentially the same procedure as surgical completion of miscarriage (a procedure performed when a women has experienced a spontaneous miscarriage but has not completely expulsed the contents of the uterus), which is also commonly performed in medical offices and other outpatient settings.  Other analogous gynecological procedures performed in such settings include diagnostic dilation and curettage, endometrial biopsy, and hysteroscopy.  Analogous non-gynecological outpatient procedures performed in such settings include vasectomy, sigmoidoscopy and operative colonoscopy.

25.     There is no medical basis for requiring that offices and clinics in which abortions are performed meet standards and requirements different from those in which analogous medical procedures are performed.

26.     Although abortion is a very safe procedure, the risks of an abortion procedure increase with the duration of the pregnancy. Therefore any delay in obtaining an abortion may cause increased risk of morbidity (major complications) and mortality (death) for the patient.

27.     Upon information and belief, there are only three medical facilities in the State of Kansas that regularly provide abortions: the Aid for Women Clinic located in Wyandotte County, the practice operated by Dr. Hodes and Dr. Nauser in Johnson County, and Comprehensive Health Center, an ambulatory surgical center operated in Johnson County by Planned Parenthood of Kansas and Mid-Missouri, which Plaintiffs believe has been inspected but not granted a license by KDHE.  The closest out-of-state provider is a Planned Parenthood clinic in Columbia, Missouri that offers only limited first-trimester abortion services.  The closest out-of-state provider of second-trimester abortion services is a Planned Parenthood clinic in St. Louis, Missouri.

**B . The Act**

28.     On May 16, 2011, S.B. 36 was enacted into law. The Act takes effect upon publication in the statute book, which is expected to occur on July 1, 2011.  The Act makes it unlawful to operate an "abortion clinic" in the state without possessing a valid license issued by the Department pursuant to the Act.   (Act, at sec. 8(a)).  There is no *mens rea* requirement for that crime.  *Id.*  Violation of this requirement is a Class A nonperson misdemeanor, Act, at sec. 8(c), punishable by one year of imprisonment and up to $2,500 in fines,  Kan. Stat. Ann. § 21-4502(1)(A);  Kan. Stat. Ann. § 21-4503(c)(1).  Conviction of a Class A misdemeanor can give

rise to the suspension, limitation, or revocation of a medical license by the Kansas Board of Healing Arts. Kan. Stat. Ann. § 65-2836(c). Violation of the Act's licensing provision also constitutes unprofessional conduct under Kan. Stat. Ann. § 65-2837(b), which can lead to suspension, limitation or revocation of a doctor's medical license by the Board of Healing Arts as well. Act, at sec. 8(c); Kan. Stat. Ann. § 65-2836(b).

29.     The Act authorizes KDHE to license, inspect, and impose penalties on facilities subject to the Act. Act, at sec. 2-3, 5-6.  With respect to licensing, the Act requires KDHE to issue a license to any facility that submits an application and meets all applicable laws and rules and regulations.  (Act, at sec. 2(c)).

30.     The Act also requires KDHE to adopt rules and regulations for the licensure of facilities that perform abortions. (Act, at sec. 9).  The rules and regulations adopted by KDHE under the Act must address "sanitation, housekeeping, maintenance, staff qualifications, emergency equipment and procedures to provide emergency care, medical records and reporting, laboratory, procedure and recovery rooms, physical plant, quality assurance, infection control, information on and access to patient follow-up care and any other areas of medical practice needed to carry out the purpose of [the Act]." *Id.*

31.     The Act provides no deadline for when the rules and regulations under the Act must be adopted by KDHE; nor does the Act require or mention the adoption of temporary regulations.

32.     Because the Act authorizes licensing on the basis of "applicable" laws, and imposes no deadline for the promulgation of regulations under the Act, KDHE could have provisionally licensed regulated facilities on the basis of their compliance with existing law and waited to apply new regulations until there had been adequate opportunity for notice and

comment on them. KDHE could also have imposed flexible minimum standards in the Temporary Regulations, especially as to the physical facility requirements.

### C. The Licensing Process

33.     On May 17, 2011, the day after the Act was signed into law, Dr. Yeomans and Aid for Women (through its chief executive officer, Mark Pederson), reviewed the law and started taking steps to try to achieve compliance.   Because the statute itself provided no details as to standards for the facility -- including room size, restroom placement and the like -- Plaintiffs had no notice at that point as to what renovations might be required.  The statute did state that the physician providing abortion services would have to have either "clinical privileges" or "admitting privileges" at a hospital within 30 miles of the facility.  (Sec. 8(b), Sec. 9(d)(3)).  The statute did not define these terms.

34.     In light of the statute, Plaintiffs took immediate steps to obtain clinical privileges for Dr. Yeomans and inquiries and applications were filed with nearby hospitals in the Kansas City area.  The granting of these privileges to Dr. Yeomans is expected imminently.

35.     On June 9, 2011, KDHE sent Plaintiffs a draft of the temporary regulations ("Draft Regs") which comprised more than 30 pages, as well as a license application form and cover letter.

36.     KDHE's letter instructed Plaintiffs to complete the application form and return it, along with an application fee and "written verification of compliance with all local codes and ordinances, fire codes and regulations, and arrangements for the removal of biomedical waste and human tissue" by June 17, 2011.   The application form included a checklist requiring the facility to indicate that it met the statutory requirements in each of the enumerated areas.  Thus, Plaintiffs were given six business days to review the draft regulations for the first time, affirm

that they complied with all of the statutory requirements (which had been interpreted in the draft regulations), and gather the required materials, including documentation of their compliance with local codes and ordinances.

37.     The June 9th draft of the temporary regulations included extensive requirements for all aspects of the medical facility, including staffing, procedures, equipment, and physical environment.  With respect to the physical facility, the June 9th draft specified particular rooms and areas required in the facility, but it did not mandate the dimensions of those rooms and areas or their precise location within the facility.   With respect to patient recovery time, the June 9th draft required that the facility specify, in accordance with "the usual standards of medical practice," a minimum length of time for a patient to remain in the recovery room based on the type of abortion procedure, gestational age of the pregnancy, and the post-procedure condition of the patient. Ex. E, Draft Regs. § 28-34-139(1).

38.     A few days after June 9, 2011, Plaintiffs-Intervenors were verbally informed by a KDHE representative that the June 9th regulations would be revised, but the nature or extent of those revisions was not disclosed.

39.     On Friday, June 17, 2011, after the close of business at 5 p.m., KDHE sent Plaintiff-Intervenor Aid for Women a copy of the revised regulations, indicating that this was the final version of the temporary regulations ("Temporary Regulations").  Plaintiffs-Intervenors received the Temporary Regulations on the morning of Monday, June 20, 2011.

40.     The Temporary Regulations are similar to the June 9th draft in a number of respects; in other respects, they impose far more rigid, detailed and onerous requirements.

41.     As a whole, the Temporary Regulations impose burdensome and costly requirements that are not medically necessary or appropriate, and that are not imposed on Kansas medical providers performing other comparable procedures.

42.     For example, the Temporary Regulations impose numerous physical facility requirements that are difficult or impossible for a medical office to meet, and that are not necessary for the provision of abortion services.  These physical facility requirements were made significantly more onerous after the initial draft regulations were changed by the Attorney General's office.   The medically unnecessary physical environment regulations include requirements that the facility have: procedure rooms of at least 150 square feet in size, Kan. Admin. Regs. § 28-34-133(b)(7); janitorial storage space of a size at least equivalent to 50 square feet per procedure room (i.e., a facility with 6 procedure rooms must have 300 sq. ft. of janitorial storage), Kan. Admin. Regs. § 28-34-133(b)(15); designated patient dressing rooms with a toilet, hand-washing station and storage for clothing and valuables, Kan. Admin. Regs. § 28-34-133(b)(2); designated staff dressing rooms with a toilet, hand-washing station and storage for clothing and valuables, Kan. Admin. Regs. § 28-34-133(b)(3); separate sets of toilet facilities specifically designated for use by patients, staff and the public, Kan. Admin. Regs. § 28-34-133(b)(5); a toilet room that is adjacent to (not just accessible from) the area in which a patient recovers, Kan. Admin. Regs. § 28-34-133(b)(4); "separate facilities" for pre-procedure hand washing (as opposed to hand-washing facilities located in the procedure rooms), Kan. Admin. Regs. § 28-34-133(b)(6); separate soiled and clean workrooms for cleaning and sterilizing used instruments, and two separate sinks in the soiled (rather than just separate clean and soiled areas within one workroom containing one sink), Kan. Admin. Regs. § 28-34-133(b)(13)-(14).

43.     The Temporary Regulations also require that every abortion patient remain in the recovery area for at least two hours after her abortion, regardless of the type of abortion procedure, the gestational age of the pregnancy, or the patient's post-procedure condition. Kan. Admin. Regs. § 28-34-139(1).  This rigid and medically inappropriate requirement was added to the regulations after the Attorney General made changes to the first draft.  In fact, this regulation is not consistent with the Act, which states that "postprocedure care consists of observation in a supervised recovery room *for as long as the patient's condition warrants.*" (Sec. 9(g)(1)). (Emphasis added).  There is generally no need to keep any abortion patient in the recovery room for at least two hours, and most patients are ready to leave in far less than one hour.

44.     The Temporary Regulations also require regulated facilities to possess unnecessary and inappropriate equipment and supplies, including pediatric-sized ventilation masks, cannulas, pulse oximeter sensors, defibrillator paddles, and EKG electrode skin contacts. Kan. Admin. Regs. § 28-34-135(c)(3), (8), (e)(1), (f) (2), (3), (4).  Plaintiffs-Intervenors do not have child-aged patients and do not deliver babies in their office.  Plaintiffs-Intervenors provide only first trimester abortions and there is no chance whatsoever of a live birth.

45.     The Temporary Regulations impose a number of ambiguous and unclear requirements, such as requiring Plaintiffs to report "to the appropriate licensing agency" any incident that could "provide possible grounds for disciplinary action by the appropriate licensing agency," Kan. Admin. Regs. § 28-34-142(f)(1)(d), (f)(2), and to "make all reasonable efforts to ensure that [an abortion patient] returns for a subsequent examination," Kan. Admin. Regs. § 28-34-141(d).  This latter provision makes no indication of whether the reasonableness of a provider's efforts will be judged by a subjective or objective standard.

46.     The Temporary Regulations impose more stringent requirements than those imposed by the State on providers of comparable medical procedures.  Moreover, in many respects (including the physical facility requirements), the Temporary Regulations impose more stringent requirements than those imposed on providers that perform much more complex and risky procedures, such as hospitals and ambulatory surgical centers.

47.     Despite the fact that it would be extremely costly, if not impossible, for Plaintiffs-Intervenors to bring their facility into compliance with the Temporary Regulations, and thus to continue providing abortions to their patients, KDHE issued an economic impact statement on June 20, 2011, that concluded that the temporary regulations "should not impose any unusual cost on regulated providers or consumers of provider services."

48.     On June 17, 2011, Plaintiffs-Intervenors submitted their application for licensing. Their application adhered to KDHE's deadline and included a cover letter,  a completed application, and the required attachments, including a summary of corporate information, a Certificate of Compliance with the Clinical Laboratory Improvement Amendments from the Centers for Medicare and Medicaid Services, an up-to-date Fire Inspection report, a letter from the Unified Government indicating a current occupational license and no reports of building code violations, an occupation tax receipt, documentation of waste collection services, and a $500 check for the application fee.

49.     By electronic  mail to Joseph Kroll at the KDHE, Plaintiffs-Intervenors requested an inspection date of June 29 or June 30, to permit licensing by July 1, 2011.

50.     In their cover letter sent with the application, Plaintiffs-Intervenors explained that Dr. Yeomans had applied for clinical privileges as soon as the statute passed and they expected the granting of temporary clinical privileges from a nearby medical center shortly, with a

permanent granting of privileges to follow.  The cover letter also indicated that abortions had been safely performed in the Aid for Women facility for years.  The letter requested a reasonable time period to achieve full compliance with the many regulations pertaining to the physical facility.

51.      KDHE verbally informed Plaintiffs-Intervenors that no waivers or exceptions would be applied, and that full and complete compliance with the new regulations was required by July 1, 2011.

52.      On June 23, 2011, Timothy Keck, Deputy Chief Counsel for the KDHE sent a letter to counsel for Plaintiffs-Intervenors stating that no inspection would be scheduled for Aid for Women.  The letter stated: "Due to the fact that the application submitted fails to document compliance with the legislation and adopted regulations, our agency cannot issue a license.  An onsite inspection will not be necessary and will not be scheduled."

53.      The June 23 letter stated that Aid for Women would be receiving an order from KDHE once the necessary paperwork had been prepared.  At no point did any KDHE official discuss with any representative of Aid for Women the basis for the denial or offer any opportunity for Aid for Women to take corrective action or obtain provisional licensing.  The KDHE has not inspected the facility and has no facts concerning any failures to comply with the Temporary Regulations.  Aid for Women has been, and is being, denied a license without any due process or any opportunity to address this matter with the KDHE.    The KDHE's denial, or stated intent to deny, appears to contradict the Act, which states that the Secretary of KDHE "upon proper notice, many deny…the license of such facility…*after notice and an opportunity for hearing has been given* to the licensee in accordance with the provisions of the Kansas administrative procedure act."    (Sec.  6(a))(Emphasis added).    Under the Act, it is therefore

apparent that any denial of a license is of no effect until notice and a hearing have been afforded to the facility.

### D.  Application of the Temporary Regulations to the Clinic

54.      Plaintiffs cannot bring their existing facility and clinic into compliance with the Temporary Regulations prior to July 1, 2011, if ever. They simply do not have additional space in their building to meet the new requirements.  If forced to move to another location, they will need up-front capital and will forced to raise the price for an abortion by hundreds of dollars.

55.      Plaintiffs-Intervenors use two procedure rooms in the clinic facility; neither of those rooms are 150 square feet in size, and a room of that size is not medically necessary for abortions or any of the other procedures Plaintiffs perform.

56.      Plaintiffs' clinic does not have anywhere near the required 300 square feet of janitorial storage, and that amount of space is unnecessary for the safe performance of abortions and the other procedures they perform or the supplies necessary to keep the office clean.

57.      Plaintiffs' clinic does not have designated patient dressing rooms; rather, a patient changes in the privacy of the procedure room in which she will undergo her procedure.  The patient's clothes and valuables stay in the same room with the patient throughout the time she is in the facility.   There is no medical basis for requiring such dressing rooms in medical practices that perform abortions.

58.      Plaintiffs' clinic does not have designated staff dressing rooms; rather, the staff comes to work dressed, and if a staff member needs to change for any reason, he or she does so in an unoccupied room. There is no medical basis for requiring such dressing rooms in medical practices that perform abortions.

59.     Plaintiffs' clinic patients recover in a recovery room near the procedure rooms.  A patient's recovery is monitored by a registered nurse in the recovery room.  A toilet room is accessible to patients recovering in procedure rooms, but is not located directly adjacent to the procedure rooms. Recovery time after an abortion is short – particularly after a first trimester abortion --  and patients are ambulatory shortly after the procedure and are able to walk to a bathroom if needed.  Plaintiffs-Intervenors' clinic does not provide 80 square feet of recovery room area for each patient.  There is no medical basis for such a requirement, and imposing such a requirement would compel Plaintiffs-Intervenors to make substantial and costly renovations to their clinic.

60.     Plaintiffs' office does not have a separate pre-procedure hand-washing area; rather, Plaintiffs wash their hands in the hand-washing sink in each procedure room.  No separate "scrub area" is needed in this setting because an abortion is performed in a clean space, but not a sterile space.  This is because surgical abortion, like any other gynecological procedure in which instruments are introduced through the vagina, is not a sterile procedure – the sterile instruments cease to be sterile once they enter the vagina.   Thus, the procedure rooms at Plaintiffs' practice are unlike a hospital operating theater, and medical personnel can wash their hands within the procedure rooms.

61.     Plaintiffs' clinic has one work area, where "soiled" and "clean" items are separate, and one sink, for cleaning and sterilizing instruments after use.  There is no medical basis for requiring that these areas or functions be contained in separate rooms, or that the workroom contain more than one sink.

62.     After an abortion at Plaintiffs' clinic, a patient remains in the recovery room under the supervision of a registered nurse.   The patient's recovery time depends on such factors

as the length of the pregnancy, the course of the procedure, and the patient's overall health condition.  The vast majority of Plaintiffs' abortion patients – all of whom obtain abortions in the first trimester -- meet the discharge criteria and are ready to go home well under an hour after the procedure.  It is medically unnecessary and burdensome to the patient to try to force her to remain in recovery after she has met appropriate discharge criteria and is ready to go home.  Keeping patients in the facility and under staff supervision for this unnecessary length of time will also greatly impair Plaintiffs-Intervenors' ability to schedule and see patients, as their rooms will be occupied by patients who do not need them.

63.     Had Plaintiffs-Intervenors been afforded the opportunity to comment on the Temporary Regulations, or seek waivers from particular physical facility regulations, they would have explained to KDHE that many of the regulatory requirements are medically unnecessary and unduly rigid; they would have shown KDHE that medical offices can meet the applicable standards of care and provide high-quality, safe health services without complying with these medically unnecessary and rigid requirements; and they would have provided KDHE with evidence of the negative impact that the Temporary Regulations and Licensing Process would have on their patients' health, specifically, and the public health generally.

64.     The Temporary Regulations and Licensing Process, absent court intervention, will force Plaintiffs to cease providing virtually all abortion services and thus to cease operation.  Although Aid for Women provides other services, such as birth control, these services are ancillary to its primary service, which is to provide abortions.

65.     Plaintiffs-Intervenors' clinic has provided abortions in a safe and secure environment in its facility at 7th Central in Kansas City, Kansas, for 21 years.  To impose new and rigid requirements, with no opportunity for comment or waivers, will cause irreparable harm

to the clinic and to its patients.  The closure of the clinic would have a very negative impact on public health and the clinic's clientele.  Aid for Women serves primarily low-income women and is the only abortion clinic in Wyandotte County.

66.     On information and belief, KDHE adopted and implemented the Temporary Regulations and Licensing Process in the ways described herein because of political pressure from the current State administration to close abortion clinics by any means necessary.

**E. Harms Imposed by the Temporary Regulations and Licensing Process**

67.     Enforcement of the Temporary Regulations and Licensing Process will force Aid for Women and Dr. Yeomans to cease their ongoing provision of abortion services at their clinic, thereby unjustifiably delaying Plaintiffs' patients in obtaining abortions.

68.     The danger in these delays is exacerbated by the fact that Aid for Women's patients are typically of lesser financial means and their options may be limited.  The Clinic's patients typically need geographically accessible facilities where they can obtain an affordable, and safe, procedure.  Delay in obtaining an abortion typically means greater cost and often requires travel of greater distances.  Plaintiffs-Intervenors' patients will suffer with these greater economic burdens and some may not be able to obtain abortions as a result.

69.     The delays caused by the Temporary Regulations and Licensing Process will expose Plaintiffs' patients to unnecessary health risks

70.     Even if one or more of the other abortion providers in the State were able to become licensed, the application of the Temporary Regulations and Licensing Process to Plaintiffs would still likely cause significant delays for their patients.

71.     Even if one or more of the other abortion providers in the State were able to become licensed, the application of the Temporary Regulations and Licensing Process to

Plaintiffs would still hinder low-income women, primarily in Wyandotte County and nearby areas, from obtaining an abortion, either because they lack transportation to a facility at a greater distance or delay in obtaining an appointment elsewhere would result in a more costly procedure at a later stage in pregnancy.

72.     Enforcement of the Temporary Regulations and Licensing Process will cause immediate and irreparable harm to the Clinic as it will result in closure of the clinic and will reduce the options available to women who are seeking to terminate a pregnancy.

73.     By imposing medically unnecessary burdens on the provision of abortion services, the Temporary Regulations and Licensing Process will cause immediate and irreparable harms to public health, especially to the health of low-income women whose options to seek services out of state may be limited or non-existent.

**F. Lack of Harm from Maintaining the Status Quo**

74.     Delaying enforcement of the Temporary Regulations and Licensing Process during the pendency of this lawsuit will not create any risk of harm to women in Kansas because the Temporary Regulations and Licensing Process are not designed to protect women's health and will not have the effect of protecting women's health; to the contrary, by imposing unnecessary requirements and impeding access to safe and legal abortion services, they will harm women's health.

75.     While the Temporary Regulations and Licensing Process are enjoined, Plaintiffs will remain subject to inspections, regulation and oversight by the Kansas Board of Healing Arts, just like other medical offices that provide comparable services.

**<u>FIRST CLAIM FOR RELIEF (Patients' Right to Privacy)</u>**

76.     Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 75 above.

77.     The Temporary Regulations and Licensing Process have the purpose and the effect of imposing an undue burden on Plaintiffs-Intervenors' patients who seek abortions presently or in the future, in violation of the Fourteenth Amendment to the United States Constitution.

### SECOND CLAIM FOR RELIEF (Plaintiffs' Right to Procedural Due Process)

78.     Plaintiffs hereby re-allege and incorporate by references paragraphs 1 through 77 above.

79.     The Temporary Regulations and Licensing Process violate Plaintiffs' right to procedural due process under the Fourteenth Amendment to the United States Constitution because they deprive Plaintiffs-Intervenors of protected property and liberty interests without providing Plaintiffs with any form of pre-deprivation hearing, including any opportunity to comment on the regulations or request waivers from KDHE.

### THIRD CLAIM FOR RELIEF (Plaintiffs' Right to Substantive Due Process)

80.     Plaintiffs hereby re-allege and incorporate by references paragraphs 1 through 79 above.

81.     The Temporary Regulations and Licensing Process violate Plaintiffs-Intervenors' right to due process of law under the Fourteenth Amendment to the United States Constitution by:  depriving them of property (including lost income and future patients) and liberty (including their ability to practice their profession) without serving any compelling, substantial, or legitimate state interest.

### FOURTH CLAIM FOR RELIEF (Plaintiffs' Right to Due Process - Vagueness)

82.     Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 81 above.

83.     The Temporary Regulations and Licensing Process violate Plaintiffs' right to due process of law under the Fourteenth Amendment to the United States Constitution by failing to give Plaintiffs-Intervenors fair notice of the requirements they must meet under the Temporary Regulations and encouraging arbitrary and discriminatory enforcement of those regulations.

**FIFTH CLAIM FOR RELIEF  (Plaintiffs' Right to Equal Protection)**

84.     Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 83 above.

85.     The Temporary Regulations and Licensing Process deprive Plaintiffs-Intervenors of equal protection of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution, by subjecting them to unique burdens not imposed on medical practices that provide comparable services, with no basis for the differential treatment other than animus.

**REQUEST FOR RELIEF**

WHEREFORE Plaintiffs-Intervenors request that this Court:

1.     Issue a declaratory judgment that the Temporary Regulations (to be codified at Kan. Admin. Regs. § 28-34-126 - 44 (2011)) and the licensing requirements of the Act (Senate Bill No. 36 (2011), at sec. 2, 8) as applied by KDHE through its adoption and implementation of the Temporary Regulations violate rights of Plaintiffs-Intervenors and their patients protected by the Fourteenth Amendment to the United States Constitution;

2.     Issue preliminary and permanent injunctive relief, without bond, restraining Defendants from: (a) enforcing the Temporary Regulations; and (b) enforcing the licensing

requirements of the Act (Senate Bill No. 36 (2011), at sec. 2, 8) until such time as KDHE has

implemented constitutionally adequate licensing procedures.

      3.      Grant Plaintiffs-Intervenors attorney's fees, costs and expenses pursuant to 42

U.S.C. § 1988; and

      4.      Grant such other and further relief as this Court deems just and proper.

## Place of Trial

Plaintiffs respectfully request that the trial of this matter be held in Kansas City, Kansas.

Respectfully Submitted,

 /s/ Cheryl A. Pilate
Cheryl A. Pilate, KS Bar #14601
Rebecca L. Kurz KS Bar #23490
MORGAN PILATE LLC
142 N. Cherry
Olathe, KS 66061
913-829-6336 Phone
913-829-6446 Fax
Email: cpilate@morganpilate.com
Email: rkurz@morganpilate.com

## CERTIFICATE OF SERVICE

I, Cheryl A. Pilate, do hereby certify that a true and accurate copy of the above and

forgoing was served on all counsel of record via the ECF system on the 6th day of July 2011.

Cheryl A. Pilate